OPINION OF THE COURT
Sarah P. Cooper, J.
Procedural History
On September 18, 2017, these res ipsa abuse cases commenced with the filing of two related petitions by the Commissioner of Administration for Children’s Services (hereinafter referred to as the petitioner or ACS) regarding injuries to the child Lisa A. (DOB: XX-XX-XXXX) (hereinafter referred to as the child). The first petition (NA-XXXXX-XX) was filed against the child’s mother, Eunice O. (hereinafter referred to as Ms. O) and the child’s babysitter, Nana B. (hereinafter referred to as Ms. B), alleging that they abused the child Lisa A. within the meaning of article 10 of the Family Court Act. The petition specifically alleges that the infant Lisa presented at the hospital on September 9 with injuries that were later determined to be a displaced fracture of the left tibia and left fibula, and a fracture of the right tibia and right fibula. The petition further alleges that in the hours leading up to the infant Lisa being taken to the hospital by her mother, Lisa had been in the care of her mother and then left in the care of Ms. B. Petitioner filed a second petition (NA-XXXXX-XX) against Ms. B, with regard to her own child Wilhemina Y. (DOB: XX-XX-XXXX), alleging that, based on Ms. B’s abuse of the infant Lisa, her own child Wilhemina was derivatively neglected. Both parents appeared in court on September 18, 2017 and issue was joined. *950 At the time the petitions were filed, the infant Lisa was still in the hospital, though medically cleared to be released. ACS asked that the court issue an order remanding the child Lisa, as well as an order releasing the child Wilhemina to the care of her non-respondent father and excluding Ms. B from her child’s home. The respondents objected to such orders and the case was adjourned to the following morning for a hearing pursuant to Family Court Act § 1027.
On September 19, 2017, the 1027 hearing commenced with the testimony of Dr. Linda Cahill who, on consent of the parties, was deemed an expert in pediatric child abuse. The court accepted into evidence, as petitioner’s exhibit Nos. 1 and 2 respectively, Dr. Cahill’s CV and medical records from Monte-fiore Hospital. ACS Child Protective Specialist Crystal E. also testified on behalf of the petitioner.
On September 20, 2017, the 1027 hearing continued with each respondent testifying on her own behalf.
Legal Analysis
The court credits the testimony of all four witnesses. After carefully considering the totality of the evidence presented at the hearing, the court finds that ACS has failed to establish that either child would be at imminent risk of harm if released to the care of their respective mothers.
On September 9, 2017, Ms. O spent the day at home with her eight-month-old daughter, Lisa. At the time, the child Lisa was developmentally capable of sitting up, pulling up to a standing position, and crawling. Ms. O testified that she observed her daughter crawling that day, pulling herself up to a standing position and falling down to a seated position, repeating that movement over and over all day. Ms. O testified that she did not notice anything unusual about her child and she changed her four times throughout the day and bathed her. Other individuals were present in her home that day, including women identified by Ms. O as Mavis, Mary and Mary’s children. However, Ms. O testified that she was in the same room as the child all day and did not leave her alone with any of the adult individuals who were in the home.
At around 8:00 p.m. that evening, Ms. O brought her daughter to Ms. B’s home so that Ms. B could babysit the child while Ms. O attended a funeral. She described Ms. B as a neighbor who lived in the next building. She gave no specific instructions to Ms. B regarding caring for her daughter and left a bag with diapers, formula, bottles, and wipes. Ms. B had babysat *951 the child on three other occasions and was familiar with the child. Both Ms. O and Ms. B testified that the child was not acting unusually when Ms. O left for the funeral and appeared to be fine.
Ms. B and Ms. O testified that the child Lisa was sleeping in her stroller when Ms. O dropped her off. When Ms. B picked the child up from her stroller, the child began to cry so she fed her a bottle to calm her down. She then wrapped the child in a baby-wearing wrap and wore her. She said the child stopped crying and fell asleep but woke up again crying soon after. At approximately 8:30 p.m., Ms. B called her cousin Mavis, who lives with the child and Ms. O, and asked her to come over to help her soothe the child. Mavis came over and played the child’s favorite song for her and the child fell asleep again briefly but woke up again crying after 9:00 p.m. Ms. B made more food for Lisa and, while she was attempting to feed the child, Ms. B’s own child, 13-month-old Wilhemina, woke up. Ms. B then gave Lisa to Mavis to have her continue to try to feed her while Ms. B fed her own daughter. At no time that evening did Ms. B change the child’s diaper and the child’s legs were covered by clothing the entire time she was at Ms. B’s home. According to Ms. B, her husband was sleeping in the home the entire time the child Lisa was there and left to go to his job before Ms. O returned for her child.
According to both respondents, Lisa was crying on Mavis’ lap when Ms. O returned to Ms. B’s home at approximately 10:00 p.m. Ms. O described it as a wailing sound but both women testified that the child Lisa did not seem unusually distressed. Ms. O testified that she picked the child up and put the child on her back to wear the child as she slept. Both respondents state that Lisa slept while Ms. B and Ms. O visited for approximately 45 minutes. Ms. B gave Ms. O the leftover food that the child had not finished eating and then Ms. O left Ms. B’s home with her daughter sometime around 11:00 p.m.
When Ms. O returned to her home and undressed the child to put her in night clothing and to have a diaper change, she noticed that the child cried when she touched her right leg to remove her pants. Ms. O noticed that the child’s right lower leg was swollen. Ms. O brought the child directly by taxi to the hospital ER at Albert Einstein Medical Center.
Hospital staff noticed that the child’s right leg was swollen and X rays were taken and it was determined that the child Lisa had two fractures on her right leg. The following day when *952 skeletal surveys were taken, they discovered that there were fractures in the left leg as well although there was no noted swelling of the left leg. The child’s legs were cast.
When Dr. Cahill first saw the child on September 11, 2017, the child’s legs were already in a cast. Dr. Cahill reviewed the child’s medical records and determined that the child’s legs were fractured in exactly the same place on each leg and likely were broken at the same time by the same event. Significantly, Dr. Cahill determined that, while that type of injury could be caused by a direct blow to the child’s legs, it is unlikely an intentional hit or blow to the child’s legs would cause a fracture in the exact same spot on both legs. Dr. Cahill testified that the child’s injuries were most likely the result of an accident. Dr. Cahill explained that the injuries were a “crushing” injury consistent with a heavy object falling on the child and that the injuries had most likely happened within five days of the child presenting at the ER. Dr. Cahill testified that in the three decades that she has served as an ER pediatric child abuse specialist she has only seen similar injuries once and that was the result of a heavy crib falling on the child’s legs.
Neither respondent has offered an explanation for the child’s injuries to either the court, hospital staff or the ACS caseworker. Ms. B maintains she was unaware of the child’s injuries until after ACS was involved and Ms. O maintains that when she first discovered the child’s swollen right leg, she immediately took her child to the hospital but she has no idea how the child sustained the injuries. Ms. O also testified that during the five days leading up to September 9, 2017, the child was in the care of a different babysitter for 12 hours on two separate days. That individual has not been named by ACS although the child was in that individual’s sole care twice for 12 hours at a time in the days leading up to the injuries.
Dr. Cahill testified that we will never know what caused these injuries but that it was likely the result of an accident. Ms. O credibly testified that she only observed swelling on the right leg, similar to what hospital staff observed. Medical staff was unaware that the left leg was even fractured until the skeletal survey was taken in the following days. A detective shared with Dr. Cahill his theory, based purely on speculation, that the child’s legs were crushed when a caretaker who had wrapped the child on her back or side unintentionally wedged the child between a hard wall or piece of furniture. Dr. Cahill testified that she interviewed both respondents and asked Ms. *953 B to demonstrate on her own 13-month-old child how she wrapped the child Lisa and carried her on the night of September 9, 2017. Dr. Cahill testified that she had Ms. B sit in a chair and in various positions near a desk and furniture and that at no time did the child’s legs get trapped or make contact with any of the furniture. She did not give much weight to the detective’s theory. Nonetheless, the detective’s theory would still put forth an accidental injury even if it were true. Nor does it make sense for the women to spend an additional 45 minutes visiting and chatting after the mother returned for her child if something nefarious had occurred in immediate hours before.
Family Court Act § 1027 (b) requires that this court consider whether continued care in the custody of the respondent would present an “imminent risk to the child’s life or health.” In Nicholson v Scoppetta (3 NY3d 357 [2004]), the Court of Appeals clarified the standard of “imminent risk” and the factors courts must weigh in deciding applications pursuant to Family Court Act §§ 1022, 1027 and 1028. The courts must consider whether the children were actually or imminently harmed by the parent’s failure to exercise even minimal care in providing them with proper oversight, examine the “special vulnerabilities of the child,” and conduct an objective evaluation of parental behavior by determining whether a reasonable and prudent parent would have so acted, or failed to act, under the same circumstances. {Id. at 370, 372.)
Pursuant to Nicholson, the court must not only identify the existence of a risk of serious harm, but also consider whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. Further, the court must balance the risk of imminent harm against the harm removal might bring, and it must determine factually which course is in the child’s best interest.
A child is abused, within the definition of Family Court Act § 1012 (e) (i), when a parent or other person legally responsible for the care of the child
“inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.”
*954 Family Court Act § 1046 (a) (ii) provides that proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect. (Family Ct Act § 1046 [a] [ii].) Therefore, a prima facie case of abuse may be established by evidence of the injury and evidence that the respondents were the caretakers of the child at the time the injury occurred. (Matter of Xavier F. [Yvette E.], 48 Misc 3d 1204[A], 2015 NY Slip Op 50959[U] [Fam Ct, Kings County 2015].) The statute authorizes a method of proof which is closely analogous to, and modeled after, the negligence rule of res ipsa loquitur. (Matter of Philip M., 82 NY2d 238, 244 [1993].)
In the present case, it is not disputed that eight-month-old Lisa has four unexplained leg fractures. However, the petitioner’s own expert witness, Dr. Cahill, testified that these injuries were most likely the result of an accident. While the court can not conclusively determine how these injuries occurred, Dr. Ca-hill’s testimony established that more likely than not, an object with great weight “crushed” the child’s legs and that the injury was unintentional. We will never know exactly when that event occurred. It may have happened in the hours before the child was treated or up to five days before the child was treated. The court credits the testimony of both respondents who maintain that they do not know how Lisa’s injuries occurred. The evidence establishes that many individuals were around Lisa in the five days leading up to her admission into the hospital and that in fact, other individuals had babysat the child during that time. Further, the evidence establishes that when Ms. O noticed her child was injured, she sought immediate medical treatment.
While the petitioner has proved that Lisa sustained serious physical injuries, the petitioner has not proved that those injuries would not have occurred but for the actions or omissions of the respondents. There is nothing in the record to suggest that either respondent acted unreasonably or imprudently.
Having failed to establish an act or omission by either respondent that led to the child Lisa’s injuries, the petitioner has also failed to establish that either child would be in imminent risk if they remained in the care of their respective mothers. Further, in balancing the risk of imminent harm with the harm of removal, this court witnessed the distress the child Wil- *955 hemina experienced in being separated from her mother on two occasions in the courtroom. The child was seated on Ms. B’s lap, swaddled in a wrap, or resting peacefully on her mother’s chest throughout the 1027 hearing. There were moments when the child became fussy and was removed from the courtroom by either her father or another relative. When she was separated from her mother the child cried loudly and continued to wail in the waiting room and her loud cries could be heard from the courtroom. Clearly Wilhemina was experiencing significant distress when she was separated from her mother.
Accordingly, it is hereby ordered that petitioner’s 1027 application is denied.
The child Lisa A. is temporarily released to the care of her mother, Eunice O., under ACS supervision and the following conditions:
1. Ms. O shall cooperate with ACS supervision including announced and unannounced visits.
2. Ms. O shall ensure the child Lisa receives all follow-up pediatric medical care, services, evaluations, assessments and prescribed medications, including any follow-up regarding the child’s leg injury, as well as follow-up X rays and imaging.
3. Ms. O shall comply with reasonable ACS referrals.
4. Ms. O shall not leave the child Lisa with anyone without prior ACS approval and clearances.
5. Ms. O shall enroll in and complete a parenting skills course.
The child Wilhemina is temporarily released to the care of her mother, Nana B., and her non-respondent father, Mr. Y., under ACS supervision and the following conditions:
1. Ms. B and Mr. Y shall cooperate with ACS supervision including announced and unannounced visits.
2. Ms. B and Mr. Y shall ensure the child Wilhemina receives all follow-up pediatric medical care, services, evaluations, assessments and prescribed medications.
3. Ms. B and Mr. Y shall comply with reasonable ACS referrals.
4. Ms. B and Mr. Y shall not leave the child Wilhemina with anyone without prior ACS approval and clearances.
5. Ms. B shall enroll in and complete a parenting skills course.